FILED

IN THE UNITED STATES DISTRICT COURT 2016 MAY 17  PM 3: 41
FOR THE MIDDLE DISTRICT OF FLORIDA
Jacksonville Division

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DISTRICT

| | | |
|---|---|---|
| LOANCARE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 3:16-CV-612-J-32PDB |
| | ) | |
| FREEDOM MORTGAGE CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff LoanCare, LLC, formerly known as FNF Servicing, Inc. ("LoanCare"), brings this action against Defendant Freedom Mortgage Corporation ("Freedom") and alleges the following:

## INTRODUCTION

1.      Within the last fifteen days, Freedom has knowingly and intentionally blocked LoanCare from  over $100 million of its funds in an effort to force LoanCare to resolve unrelated litigation between the parties on terms favorable to Freedom, and continues to wrongfully deny LoanCare possession of over $20 million of those funds.

2.      Freedom's conduct is intentional, deliberate, and malicious, for the purpose of extorting money from LoanCare.

3.     LoanCare brings this action for conversion, fraud, tortious interference with contracts and business expectancies, and constructive trust.

## PARTIES, JURISDICTION, AND VENUE

4.     LoanCare is a Virginia limited liability company with its principal place of business in Virginia and with an office in Jacksonville, Florida.   None of LoanCare's members is a resident of New Jersey.   LoanCare is an indirect subsidiary of Fidelity National Financial, Inc., which is headquartered in Jacksonville.  LoanCare does business in Florida and conducts over $1.5 billion in annual business from Florida, servicing over 537,000 loans with a total unpaid principal balance over $107.9 billion.

5.     Freedom is a corporation organized under the laws of New Jersey, with its principal place of business in New Jersey, and it is duly registered to do business in Florida.   Freedom does business in Florida and conducts a significant portion of its nationwide business from Florida.

6.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. Complete diversity of citizenship exists between the parties, and the matters in controversy exceed $75,000.

7.     This Court may exercise personal jurisdiction over Freedom because it engages in systematic and continuous activities in Florida, is licensed by the Florida Office of Financial Regulation to offer and sell mortgage loans, is registered with the Florida Secretary of State to transact business in Florida, and has a registered agent for

service of process in Florida. Freedom has large offices in Jacksonville and every other major city in Florida, including Orlando, Tampa, Daytona Beach, Ft. Myers, Naples, and many others. In significant part, LoanCare's claims arise out of or are related to Freedom's Florida contacts.

8.     Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. § 1391(b)(1), because Freedom, the sole defendant, resides in this district.

## FACTUAL BACKGROUND

9.     Freedom is a nationwide home mortgage loan lender. For over fifteen years, until April 2016, LoanCare serviced many of Freedom's outstanding mortgage loans. In January 2016 Freedom notified LoanCare that it would terminate the agreement between the parties effective on June 30, 2016 and that all of Freedom's loans would transfer back to Freedom no later than May 3, 2016. Freedom also advised that it was replacing LoanCare with a different loan servicing company and asked LoanCare to transfer the mortgages and servicing balances.

10.     Unbeknownst to LoanCare, Freedom had devised a fraudulent scheme to execute the unwinding of the parties' business relationship in a manner that would induce LoanCare to both transfer and advance funds  on Freedom's behalf and would result in leaving Freedom with $111 million of LoanCare's money. Freedom's plan was to hold this $111 million hostage in an effort to force LoanCare to settle unrelated business litigation between the parties.

3

11.     Freedom executed its scheme by inducing LoanCare to advance funds relating to over 75,000 loans from its disbursement clearing account, with full knowledge that, contrary to the parties' standard practice and course of dealing for fifteen years, Freedom would then block LoanCare from debiting Freedom's custodial accounts to obtain reimbursement of advances and payment of charges owed by Freedom to LoanCare.

12.     Specifically, as part of its servicing obligations, LoanCare advanced on Freedom's behalf funds paid on its borrowers' loans for certain loan-related expenses, including corporate advances (*e.g.*, costs associated with foreclosure), escrow advances (*e.g.*, taxes, insurance, etc.), and direct costs (*e.g,* out-of-pocket expenses that Freedom would have incurred) (collectively, "Advances"). LoanCare also incurred costs relating to other services performed in conjunction with its servicing duties ("Other Charges").

13.     Under the parties' Subservicing Agreement (copy attached as Exhibit 1), Freedom is obligated to pay all Other Charges incurred by LoanCare and to reimburse LoanCare for all Advances.

14.     For over 15 years, with Freedom's full knowledge and consent, LoanCare paid and/or reimbursed itself for Advances by debiting certain custodial accounts ("Custodial Accounts"). These are trust accounts, owned by Freedom which LoanCare has authority to withdraw funds for the purpose of rapid distribution of funds in that account, for the benefit of borrowers and reimbursement of LoanCare. The Custodial

Accounts are in Freedom's name, but only LoanCare employees have signature authority to debit funds from these accounts.

15.     The funds received from the debits were deposited into LoanCare's disbursement clearing account (the "Disbursement Account").    The Disbursement Account is, in essence, LoanCare's operating account, and it uses the funds in its Disbursement Account to pay various expenses on all of the loans it services, not just those loans that it serviced for Freedom.

16.     In late April 2016, in connection with the unwinding of the parties' business relationship, LoanCare assisted Freedom in the transfer of servicing of thousands of loans that LoanCare had been servicing for Freedom.

17.     On April 29, 2016, LoanCare transferred to Freedom the servicing of 1,750 loans, which were owned by private investors (the "Investor Loan Transfer").  As part of the transfer, LoanCare removed the escrow-related balances for the loans from its servicing system, as those balances would be transferred to Freedom with the servicing of the loans.  As was normal course of dealing between the parties, LoanCare was able to debit the Custodial Accounts to reimburse itself for Advances paid out of its Disbursement Account on Freedom's behalf for those loans in the Investor Loan Transfer.

18.     On May 3, 2016, LoanCare transferred to Freedom the servicing of 59,479 loans, which were guaranteed by Ginnie Mae (the "Ginnie Mae Transfer").  As part of

the transfer, LoanCare removed the escrow-related balances for the loans from its servicing system, as those balances would be transferred to Freedom with the loans.

19.     On the same day, the servicing of approximately 16,000 loans serviced by LoanCare under the Agreement were transferred from Freedom to Lakeview Loan Servicing, LLC, of Coral Gables, FL, another lender/servicer (the "Lakeview Transfer"). LoanCare continues to service the loans, notwithstanding the transfer.

20.     In accordance with the parties' standard practice, LoanCare, in early May, attempted several debits from the Custodial Accounts to pay and/or reimburse LoanCare for Advances. The debits totaled $111,643,225.85.

21.     At the same time, LoanCare wired from its Disbursement Account to Freedom's accounts a total of $66,134,172.36, which reflected the borrower escrow balances associated with the Ginnie Mae Transfer, less Advances due to LoanCare under the Agreement.

22.     On May 5, LoanCare wired from its Disbursement Account to Freedom's accounts a total of $11,906,904.45, which reflected (a) the April 2016 distribution due to Freedom under the Subservicing Agreement, and (b) escrow and corporate advance refunds due to Freedom under the Agreement, less Advances and Other Charges due to LoanCare under the Agreement.

23.     Although Freedom accepted LoanCare' wire payments – totaling $78,041,076.81 – Freedom instructed the banks at which its Custodial Accounts are held

to refuse more than twenty debits attempted by LoanCare, which totaled $111,643,225.85, even though the debits were made by duly authorized Custodial Account signatories and while Freedom simultaneously accepted a deposit to the Custodial Accounts for approximately $11,466,544.20 from LoanCare.

24.     Freedom instructed LoanCare to make its wire payments to Freedom's Custodial Accounts knowing that it would reject LoanCare's debits.

25.     This was the first time any debit of LoanCare was blocked by Freedom. LoanCare has never experienced this issue on any of its other servicing agreements.  In fact, LoanCare has a similar process with its other customers, and it has never had a debit rejected before.

26.     Freedom intentionally blocked these debits in an effort to harm LoanCare and its business.  Not coincidentally, on May 6, Freedom sued LoanCare in New Jersey alleging breaches of the Subservicing Agreement.  Though Freedom's lawsuit is substantively unrelated to facts at issue here, Freedom's blocking LoanCare from possession of its money is designed to pressure LoanCare to resolve the lawsuit on Freedom's terms.

27.     On May 9, 2016, LoanCare first learned  that Freedom had caused the debits to be rejected.  LoanCare immediately contacted Freedom about the issue. Freedom at first stated it was just a mistake.  The next day, however, Freedom sent LoanCare a copy of its New Jersey lawsuit and implied that the funds would be withheld

unless LoanCare settled.  Freedom also demanded that LoanCare provide documentary support for the debits, even though Freedom had never before requested such information from LoanCare.

28.     On May 11, 2016, LoanCare provided Freedom with documentary support for its debits.  Freedom claimed that the support provided was insufficient and refused to pay the money due to LoanCare.

29.     On May 12, 2016, after several communications between the parties, Freedom effectively acknowledged its wrongful blocking by wiring $66,134,172.36 to LoanCare.  On May 17, Freedom released to LoanCare $17,961,071.64 in funds related to the Lakeview Transfer.  However, Freedom still refuses to pay the remaining $23,832,042.03 to LoanCare, even though these funds belong to LoanCare, and even though the debits had been made by authorized Custodial Account signatories.

## COUNT ONE – FRAUD

30.     LoanCare realleges paragraphs 1-29.

31.     Beginning on or about April 29, 2016, Freedom employees instructed LoanCare to wire to Custodial Accounts the funds associated with the Investor Loan Transfer and the Ginnie Mae Transfer.

32.     LoanCare wired to Freedom $66,134,172.36 on May 4, 2016.

33.     LoanCare wired to Freedom $11,906,904.45 on May 5, 2016.

34.     LoanCare made the wire payments in reliance on Freedom's instructions and its understanding that Freedom would pay and/or reimburse LoanCare pursuant to the terms of the Subservicing Agreement and the parties' consistent practice for fifteen years.

35.     With the specific intent of deceiving LoanCare, Freedom instructed LoanCare to make these payments to Freedom knowing that it would (and in fact, did) refuse LoanCare's corresponding debits to the Custodial Accounts for payment and/or reimbursement of funds to which LoanCare was entitled.

36.     LoanCare relied on Freedom's statements instructing it to make the wire transfers to its detriment.

37.     As a result of Freedom's intention to mislead LoanCare to its detriment, Freedom has wrongfully obtained funds and is blocking LoanCare from possession and use of its funds in the amount of $23,832,042.03.  Freedom is entitled to that sum, plus consequential damages.

38.     Freedom's conduct was intentional, willful, and/or wanton, and LoanCare is entitled to an award of punitive damages.

## COUNT TWO – CONVERSION

39.     LoanCare realleges paragraphs 1-29.

40.     LoanCare is the owner and has a right to the immediate possession of the $23,832,042.03 in the Custodial Accounts.

41.     Freedom is wrongfully exercising dominion and control over $23,832,042.03 in the Custodial Accounts, and has deprived LoanCare of its possession of the funds.

42.     As a direct and proximate result of Freedom's misappropriation and conversion, LoanCare has sustained damages of no less than $23,832,042.03, plus consequential damages.

43.     Freedom's conduct was intentional, willful, and/or wanton, and LoanCare is entitled to an award of punitive damages.

## COUNT THREE – TORTIOUS INTERFERENCE WITH CONTRACT AND BUSINESS EXPECTANCIES

44.     LoanCare realleges paragraphs 1-29.

45.     LoanCare uses its Disbursement Account to satisfy its obligations under LoanCare's servicing contracts with other clients.

46.     These obligations to other clients include the advancement of expenses on behalf of borrowers, which include tax and insurance payments.

47.     LoanCare has a valid business expectancy in satisfying these obligations to its other clients and borrowers that is likely to continue into the future absent Freedom's interferences.

48.     Freedom was and is aware of LoanCare's business expectancy with other clients and borrowers, and is aware that LoanCare uses its Disbursement Account to satisfy its obligations to other clients.

49.     Freedom blocked the $23,832,042.03 with the intent of hindering LoanCare from satisfying its obligations to other clients and borrowers.

50.     Freedom has intentionally interfered with LoanCare's valid business expectancy by willfully, deliberately, and maliciously withholding Advances and Other Charges from being distributed to LoanCare and deposited into its Disbursement Account.

51.     Freedom's intentional interference with LoanCare's contracts and business expectancies is an effort to gain leverage in its unrelated New Jersey litigation against LoanCare.

52.     As a result of Freedom's interference, LoanCare has been damaged in the amount of $23,832,042.03, plus consequential damages.

53.     Freedom's conduct was intentional, willful, and/or wanton, and LoanCare is entitled to an award of punitive damages.

## COUNT FOUR – CONSTRUCTIVE TRUST

54.     LoanCare realleges paragraphs 1-29.

55.     The law imposes a constructive trust both on property that has been acquired by fraud or improper means and also on property that has been fairly and properly acquired, if it is contrary to principles of equity and justice that it should be retained, for the acquirer's own benefit.

56.     Here, Freedom holds the funds remitted by LoanCare subject to a constructive trust, because Freedom acquired these funds by fraud or improper means.  In the alternative, even if Freedom properly acquired the funds properly, the funds are nevertheless subject to a constructive trust, because equity and justice dictate that Freedom should not benefit from these funds or be unjustly enriched.

57.     As a result, LoanCare should be awarded the funds held in constructive trust by Freedom, in the amount of $23,832,042.03.

## **RELIEF REQUESTED**

LoanCare requests that, after due proceedings, the Court:

a.      Enter judgment in favor of LoanCare on Counts One through Four;

b.      Award compensatory damages in an amount to be determined at trial, but no less than $23,832,042.03;

c.      Award punitive damages; and

d.      Award such other relief as this Court deems fair and just.

## DEMAND FOR JURY

LoanCare requests a trial by jury on all triable issues.

Dated: May 17, 2016

Respectfully submitted,

BEDELL, DITTMAR, DeVAULT, PILLANS & COXE
Professional Association

By: _____
John A. DeVault, III
Florida Bar No. 0103979
Primary E-mail: jad@bedellfirm.com
Secondary E-mail: ghw@bedellfirm.com
Courtney K. Grimm
Florida Bar No. 0953740
Primary E-Mail: ckg@bedellfirm.com
Secondary E-Mail:  mam@bedellfirm.com
The Bedell Building
101 East Adams Street
Jacksonville, Florida  32202
Telephone:     (904) 353-0211
Facsimile:     (904) 353-9307

Stuart H. Singer
Florida Bar No. 377325
E-Mail: ssinger@bsfllp.com
William T. Dzurilla
Florida Bar No. 757861
E-Mail: wdzurilla@bsfllp.com
**BOIES, SCHILLER & FLEXNER LLP**
401 East Las Olas Blvd. Suite 1200
Fort Lauderdale, FL 33301
Telephone: (954) 356-0011
Facsimile:  (954) 356-0022